UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MARTIN STEVENS,                          )
        Plaintiff,                      )
                                       )
        v.                               )          Cause No.: 2:13-CV-336-PRC
                                       )
SCHOOL CITY OF HOBART,                   )
PEGGY BUFFINGTON,                        )
CHRISTOPHER N. KING,                     )
and BARBARA STOOKSBURY,                  )
        Defendants.                     )

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 20] and Plaintiffs' Motion for Partial Summary Judgment [DE 21], both filed on February 16, 2015. These motions became fully briefed on March 27, 2015, and March 25, 2015, respectively. Also before the Court is Defendants' Motion to Strike Affidavit [DE 41], filed on May 22, 2015. This motion became fully briefed on June 2, 2015.

This case stems from Plaintiff's resignation from his job in the technology department of Defendant School City of Hobart ("the School") on April 18, 2012, following accusations of child molestation by a former student. Plaintiff filed an eleven-count Complaint in Lake County, Indiana, Superior Court on August 21, 2013, alleging both federal and state-law claims relating to his resignation, which he alleges was coerced, as well as a subsequent order from Defendant Peggy Buffington, the School's superintendent, that he was not allowed to come onto school property without permission.

1

Defendants removed this case to the United States District Court for the Northern District of Indiana on September 23, 2013, on the basis of federal question jurisdiction. On December 10, 2013, the undersigned Magistrate Judge was advised that all parties had filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. This Court thus has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## I. Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing'—

that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## II. Defendant's Motion for Summary Judgment

### A. Material Facts

Plaintiff was employed by the School from September 1998 through April 18, 2012. During that time he worked as a substitute teacher, a substitute custodian, a custodian, and in the School's technology department as a district technician.

Starting in 1998, while he was working as a substitute teacher, Plaintiff formed a close bond with a young male student, which continued for some time. In 2002, the child's mother made a complaint to Child Protective Services due to her concerns about Plaintiff's relationship with her son. The School suspended plaintiff for one day while an investigation was performed. The investigation concluded that the allegations of misconduct were unfounded, and Plaintiff returned to work. The mother then signed a document rescinding her accusations.

The mother, who apparently has some psychological issues and was in a difficult period of her life, then moved in with Plaintiff along with her two boys. (The eldest was the one whom

she had accused Plaintiff of molesting.) The relationship between Plaintiff and the Mother was platonic. After two years, she abruptly moved out.

In 2005, the allegations of child molestation resurfaced after the boy, who was still a student at the School, went to his assistant principal and reported sexual misconduct by Plaintiff. As before, the matter was investigated, and Plaintiff was temporarily suspended. The police officer who interviewed the child caught him in a discrepancy and came to the conclusion that the accusations were unfounded. Plaintiff then returned to work.

Starting on December 6, 2010, Plaintiff began working in the School's technology department. In that position he reported to Defendant Christopher King (his immediate supervisor), Russell Mellon (the Director of Technology), and, ultimately, Defendant Peggy Buffington (the School's Superintendent). Plaintiff had been advised to refrain from working overtime without authorization to do so. He never sought authorization, and he never turned in any records indicating that he had worked more than forty hours per week. But he did in fact work more than forty hours per week on numerous occasions.

Plaintiff had a few disciplinary issues in this job, and his coworkers complained about his behavior on a few occasions. Three of the four times he was disciplined occurred while he worked in the technology department under Defendant King. He felt hated by Defendant King, but had a good relationship with Defendant Buffington.

In the spring of 2012, Plaintiff met in a public place with the now-adult boy who had accused him of sexual abuse. During the conversation, the boy told Plaintiff that there was a pregnancy scare and that he needed money. Shortly thereafter, on Easter Sunday, 2012, the boy left phone messages with some administrators at the School, telling them that they had a

pedophile in their ranks, namely, Plaintiff. The same day, the mother called Plaintiff and let him know about the phone calls, claiming that the boy had been "messed up for life."

There was no school the next Monday, but Plaintiff met with school resource officer Joe Clemmons as well as Mellon and Defendant King. Plaintiff asked them to tell Buffington about the messages so that no one would be "blindsided" by them.

On April 10, 2012, Plaintiff met with Buffington and King at the School's administrative building. Buffington commended Plaintiff for coming forward and told him that it was her job to prove him innocent. Plaintiff responded that it would be easier to prove innocence to murder than to child molesting because the dispute came down to his word against the boy's and the boy's mother's. Buffington put School Safety Officer Larry Juzwicki in charge of investigating the allegations and placed Plaintiff on administrative leave. Juzwicki interviewed the boy twice, but he never spoke with Plaintiff.

Then, on April 18, 2012, Buffington, King, and Officer Juzwicki held a meeting with Plaintiff in Buffington's office at the school administration building. Plaintiff had mentally prepared himself to be fired since his email account had been deactivated earlier that day. He was worried that he would also be arrested for something that he did not do. Plaintiff was under the impression that Defendants felt that they had no other option but to fire him since the school didn't need this type of publicity.

Plaintiff arrived at the administrative building at the agreed-upon time—4:00 p.m.—and waited. At around 4:20 p.m., Buffington asked Plaintiff to come into the meeting. He walked in first, followed by Buffington. There were two open chairs. As Plaintiff testified in his deposition, common sense told Plaintiff that he'd be sitting in the chair by the window, which is where Buffington indicated that he should sit. Officer Juzwicki wore the same police equipment (e.g.,

gun, handcuffs, etc.) he wore on a daily basis. But Plaintiff was concerned to see it that day since he thought they might be preparing to be physical with him should the meeting get out of control.

On the table was a file folder about one and one-half inches thick. The name of the boy who had accused Plaintiff was handwritten on the folder tab. Buffington then told Plaintiff that this was a complex case and that the investigation was about halfway complete. Buffington had a pen in her hand, which she then put down on the table, telling Plaintiff that he had a choice: he could either resign or the investigation could proceed. She tapped her finger and motioned to the file folder, saying that the investigation had uncovered "disturbing," in some cases "alarmingly disturbing," information.

Plaintiff said that he was confused and asked Buffington what was in the folder. She responded that if he wanted to discuss the contents of the folder, the investigation would proceed; otherwise, he could resign. She reiterated that there was alarming and disturbing information in the file. Plaintiff said that the accusations were fabricated and said that he had documentation that would cast doubt on them. Buffington said that he could give them the documentation and proceed with the investigation. Plaintiff then said he felt backed into a corner. She told him that he had a choice. He asked if he could consider overnight, and she told him no, that they needed an answer that day.

At some point, Buffington left the room. During her absence, nothing stood between Plaintiff and the door, but he made no effort to leave. A short time later, she returned with three pieces of blank white paper. She then asked what his decision was going to be. He said that he felt that he didn't have any choice. Buffington responded that it was his choice.

At this point, Plaintiff said that he had to do what was best for himself and the school system, he couldn't allow the school system to keep going through these accusations. She then

slid the papers across the desk to Plaintiff. Plaintiff asked whether he was supposed to write something. Buffington responded that, if he was going to resign, she would need it in writing. He then wrote out his resignation, telling those present that this was in the best interest of everyone, especially the School. Buffington told Plaintiff that, if he did in fact molest the boy who brought the accusations, he should get help so that he wouldn't do it again. However, if he was innocent, she told him that she hoped he wouldn't apply to work for another school system because the mother would continue to do this to him.

Plaintiff then left. On his way out, Buffington shook his hand and wished him the best. At no point during the meeting did Plaintiff try to leave; no one told him that he was not free to leave or tried to block his way out of the room. Officer Juzwicki never stood up, nor did he put his hand on his gun or make any threatening gesture. Plaintiff, however, felt intimidated by his presence.

About fifteen minutes after he left, Buffington emailed him, informing him that he should refrain from being on School property and that it would be considered trespass for him to do so without permission. She did this pursuant to a School policy that grants the superintendent the authority to prohibit the entry of any person onto School property or to expel any person when there is reason to believe that his or her presence would be detrimental to the good order of the School.

That evening Plaintiff sent a message via Facebook to about 150 of the School's employees. He had written a first draft before the meeting, addressing what he believed would be his termination. After he resigned and returned home, he edited the message to show that he had resigned and explained why he had chosen to do so. He maintained his innocence, but he stated that he had not been strong-armed into resigning.[1] He explained that it would have been much more draining on the school system, as well as on him, to continue. He also said that working with everyone at the School had been an amazing blessing and that it broke his heart to realize that he was no longer a part of the School family. He encouraged the recipients to share the message with other employees of the School, but it was not for distribution to the public.

The next morning there was a meeting of the School's administrators. The meeting was confidential. At this meeting, Buffington said that Plaintiff had an inappropriate relationship with a male student and that she had proof of his guilt and had asked for his resignation, explaining that he was no longer employed by the School. She stated that he had no choice: he had to resign or he would be fired.

Following his resignation, Plaintiff asked for compensation for retirement contributions from the School as well as unpaid overtime and unused vacation time. He contacted Barbara Stooksbury, the School's attorney, who responded that he needed to contact the Public Employees Retirement Fund directly regarding taking control of his retirement benefits. The money he contributed was refunded to him, but he has not received the money contributed by the School.

Plaintiff testified that he had no need to be on School grounds, but also expressed a wish to attend School board meetings, to use the School's track, to attend School Events (e.g., sports

---

[1] At his deposition he testified that by "strong-armed" he meant being forced by violence. He testified that he felt that he had been coerced, but not strong-armed.

and music), and to vote at the School. He has twice asked and been given permission to enter onto School property: once to vote, and another time to attend his niece's graduation. Defendant Buffington testified that she thought the ban was necessary since having Plaintiff on School property would disrupt the learning environment since Plaintiff had been accused of child molestation and the accuser's younger brother was, for some of that time period, at least, a student at the School. (This is supported by the testimony of Officer Juzwicki who suspected that Plaintiff was banned because of the child molestation accusations.) Defendant Buffington also said that Plaintiff had written Facebook posts that she thought were threatening.

Prior to bringing this lawsuit, and about ten months after he resigned, Plaintiff notified the Department of Labor about his complaints, but it declined to pursue the matter. Plaintiff has never been charged with any crime.

## B. Analysis

Plaintiff's Complaint alleges that Defendants are liable for wages due under the Fair Labor Standards Act (FLSA) (Count I), for Defamation (Count II), for False Imprisonment (Count III), for Violations of the Indiana Access to Public Records Act (APRA) (Count IV), for Intentional Infliction of Emotional Distress (Count V), for Civil Conspiracy (Count VI), for Violations of 42 U.S.C. § 1983 (Count VII), for Negligence (Count VIII), for Negligent Infliction of Emotional Distress (Count IX), and for Retaliatory Discharge (Count X). Count XI does not allege a separate basis of liability, but rather requests injunctive relief that the Court order the school to produce the allegedly illegally withheld documents and allow Plaintiff to go onto School Grounds. Defendants ask that Summary Judgment be granted in their favor as to all of Plaintiff's Claims.

### 1. Fair Labor Standards Act

One of the central issues in this case is whether Plaintiff is owed money for uncompensated overtime work at the School. This claim is brought against Defendant Buffington and the School pursuant to the Fair Labor Standards Act (FLSA), which "requires employers to pay overtime to certain employees who work more than 40 hours in a work week." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) (citing 29 U.S.C. § 207(a)). The parties agree that Plaintiff is covered by the FLSA's overtime payment provisions, but they disagree about whether the evidence before the Court can sustain Plaintiff's allegations.

To prevail on a FLSA claim for unpaid overtime, Plaintiff must prove (1) that he worked overtime without compensation and (2) that his employer knew, or should have known, about the overtime work. *Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2014 WL 6978813, at *11 (N.D. Ill. Dec. 10, 2014) (citing *Kellar*, 664 F.3d at 176–77; 29 C.F.R. § 785.11). To satisfy the first requirement, Plaintiff must establish a violation of the FLSA and also establish damages. *Brown v. Family Dollar Stores of IN, LP*, 534 F.3d 593, 595 (7th Cir. 2008) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) superceded by statute on other grounds as stated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005)). Plaintiff's testimony supports a conclusion that he in fact worked overtime and was not appropriately compensated for that work. This testimony is thus sufficient to show that an issue of material fact exists as to whether the School violated the FLSA. *See Kellar*, 664 F.3d at 175 ("Absent a finding . . . that the usual requirements for evidence at the summary judgment stage were not met, evidence presented in a 'self-serving' affidavit or deposition is enough to thwart a summary judgment." (citing *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003)).

Whether he has established damages is a more complicated question. Employers have a duty under the FLSA to keep records "of the wages, hours, and other conditions and practices of employment," 29 U.S.C. § 211(c), and a plaintiff can prove damages simply by pointing to those records. *Brown*, 534 F.3d at 595.There are no such records before the Court in this dispute, however. And when, as is the case here, work records are inadequate or inaccurate, the plaintiff can prove damages by producing "sufficient evidence to show the amount and extent of th[e] [overtime] work as a matter of just and reasonable inference." *Id.* (quoting *Mt. Clemens Pottery Co.*, 328 U.S. at 687) (internal quotation marks omitted). Plaintiff's burden in this regard is not high. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (citing *Mt. Clemens Pottery Co.*, 328 U.S. at 687). And a plaintiff "need not corroborate his testimony regarding the amount of overtime he worked with precise documentation or records." *Blakes*, 2014 WL 6978813, at *18 (citing *Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 815 (N.D. Ill. 2011)). If a plaintiff satisfies this requirement, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Mt. Clemens Pottery Co.*, 328 U.S. at 687–88.

Plaintiff's original affidavit, attached to his response to Defendants' Motion for Summary Judgment, states that he went over pertinent Help Desk records provided by Defendants through discovery and calculated that he was owed $15,616 in unpaid overtime as well as $1,579 in unpaid retirement contributions.[2] But this affidavit says nothing about how often or when Plaintiff was working more than forty hours in a given week. This is insufficient to show the

---

[2] "A help desk is a resource intended to provide the customer or end user with information and support related to a company's or institution's products and services." *Help desk*, Wikipedia (July 2, 2015, 3:15 AM), https://en.wikipedia.org/wiki/Help_desk. The Help Desk records before the Court are basically records of IT service requests at the School.

amount or extent of the overtime work. However, as this affidavit suggests that some records did in fact exist that might satisfy the law's requirements, the Court ordered the parties to provide the Court with supplemental briefing on the issue, along with appropriate evidence. They have done so.

Attached to Plaintiff's supplemental brief is a second affidavit signed by Plaintiff, which addresses the issue of work records as well as whether Defendants knew that he had been working overtime. In that affidavit, Plaintiff explains that he looked at the Help Desk records and tabulated 194 occasions where he worked an average of 2.25 hours of overtime. He also says that he recalls working about five additional hours of overtime per week between December 2010 and April 2012. He also says that he worked an additional thirty-one hours of overtime fixing a school bell in the Fall of 2011.This adds up to 787.5 hours of allegedly unpaid overtime. He states that he was paid an annual salary of $27,500, which, at forty hours per week, works out to just over $13.22 per hour. His overtime rate would thus be just over $19.83 per hour. This multiplies to $15,616.13 in overtime.[3]

Defendants object that this evidence is too vague and unsupported to allow a trier of fact to calculate damages. They thus contend that Plaintiff has not met his burden and therefore ask that the second affidavit be stricken.

As explained above, Plaintiff does not need to produce meticulous records of his own, but may rely on his own recollection. Moreover, he has supported those recollections using the Help Desk records. These records, as Defendants point out, don't say anything about the hours worked, but they appear to have been "triggering factors," which "would have signaled extended work hours" to Plaintiff. *See Brown*, 534 F.3d at 597. Plaintiff's explanation on this point is

---

[3] He also claims that he is entitled to compensation for some sixty-six hours of overtime he worked during the 2011 registration period, but this amount does not appear in his damages calculation.

generalized, and it presents a closer case than many FLSA cases in this circuit, but at this summary judgment stage it is enough to support a reasonable inference as to the amount of damages. And that is what counts.

This leaves the question of whether Defendants knew or should have known that Plaintiff was working overtime. Plaintiff admitted at his deposition that he didn't give Defendants documentation regarding the overtime he alleges he worked. He testified at his deposition that his contract specifically stated that he was exempt from overtime pay. However, he adds in the supplemental affidavit that he told Defendants King and Buffington that he was working more than forty hours some weeks and should be getting overtime pay. He says that they told him that he was exempt and that they informed him that he had understood this before he accepted the job.

Defendants contend that the affidavit contradicts Plaintiff's deposition testimony because he didn't mention the conversations with Defendants Buffington and King at his deposition despite having an opportunity to do so. They argue that "the clear and only reasonable inference from his deposition testimony is that he learned of his purported exempt status from the contract" rather than from those conversations. DE 42 at 3. This simply isn't true. It's quite possible to read his affidavit as simply explaining *how* he came to the conclusion that his contract stated that he was an exempt employee. In fact, as Defendants point out in a footnote immediately following the passage just quoted, the contract *didn't* say that Plaintiff's position was exempt from overtime.

Plaintiff's understanding of the arrangement would also explain why he didn't submit any overtime request documents (a very different action than *working* overtime—a distinction Defendants elide) since he had been told that he was not allowed to do so. Nor is his statement

that he didn't submit records necessarily inconsistent with his talking with Defendants Buffington and King about whether he was entitled to be paid for overtime work.

Defendants also contend that the affidavit is too vague to be considered because it never specifies how many times or when the conversations took place. This argument is without merit. A reasonable factfinder could conclude that Plaintiff had informed his employer about overtime work even without knowing exactly when or how often those conversations took place. The affidavit's statement that Plaintiff had talked with Defendants King and Buffington about payment for overtime work is sufficient to create a genuine issue of material fact about whether Defendants knew about his overtime work.

Defendants also contend that Plaintiff's FLSA claim is barred in part by the statute of limitations. The FLSA provides a two-year statute of limitations in most cases, but if the cause of action arises "out of a willful violation" of the law, the statute of limitations is three years. *See* 29 U.S.C. § 255(a). This lawsuit was filed on August 21, 2013, and Plaintiff can recover nothing from those parts of his claim that accrued before August 21, 2011, unless the School and Defendant Buffington acted willfully.

Under § 255(a), violation is willful "if defendant knew it was violating law or was indifferent to that possibility." *McDonald v. Vill. of Palatine, Ill.*, 524 F. App'x 286, 289 (7th Cir.) (citing *E.E.O.C. v. Madison Cmty. Unit Sch. Dist. No. 12*, 818 F.2d 577, 585 (7th Cir. 1987)). At her deposition, Defendant Buffington testified that Plaintiff was not an exempt employee and that "[i]f he requested overtime from his direct supervisor, and the direct supervisor okayed it he would be afforded overtime." DE 27-3 at 9. This is supported by Buffington's affidavit, which states that, in the years before Plaintiff joined the technology department, other computer technicians had worked overtime and presumably were paid for it.

However, as mentioned above, Plaintiff's second affidavit notes that he spoke with Defendants Buffington and King about getting paid for his overtime work and that they each responded that he was exempt from overtime and that this had been made clear to Plaintiff from before he took the position in the technology department. It wouldn't be unreasonable to conclude from these facts that Defendant Buffington knew that she knew she was violating the FLSA and there thus is an issue of material fact as to whether the School and Defendant Buffington acted willfully.

Plaintiff also claims that he is entitled to PERF contributions that he alleges never vested. He never explains how these payments (which are not for overtime work) come under the scope of the FLSA. Summary judgment is therefore appropriate on this claim.

## 2. FLSA Retaliatory Discharge

Plaintiff alleges that his firing was retaliation for telling Defendants about the molestation allegations under the FLSA and for asking about unpaid overtime pay and PERF benefits. Section 215 of the FLSA "prohibits an employer from discriminating against an employee in retaliation for asserting an FLSA claim." *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999). There are two ways for Plaintiff to establish his claim. Under the direct method, Plaintiff can present a *prima facie* case of retaliation by showing (1) that he engaged in "protected expression," (2) that he "suffered an adverse employment action," and (3) "that a causal link existed between the protected expression and the adverse action." *Id.* (citing *Eiland v. Trinity Hosp.*, 150 F.3d 747, 749 (7th Cir. 1998)). The indirect method

> requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence

> of a noninvidious reason for the adverse action, he is entitled to
> summary judgment. Otherwise there must be a trial.

*Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Plaintiff has

presented no evidence regarding similarly situated employees, and he thus cannot succeed under

the indirect method.

Assuming for the moment that he was forced to resign and thus suffered an adverse

employment action, he must then show that direct or circumstantial evidence supports finding a

causal connection between a complaint and the forced resignation. *See Hobgood v. Ill. Gaming

Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). The Seventh Circuit Court of Appeals has noted that

"admissions of illegal discrimination and retaliation are rare" such that it is "not surprising [when

a plaintiff] has not presented a 'smoking gun' confession by [the defendant]." *Id.* at 643.

Plaintiff offers no direct evidence for his claim of retaliation, and he must therefore

satisfy the direct method with "a convincing mosaic of circumstantial evidence" if he is to avoid

summary judgment. *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (quoting *Ridings v.

Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)). The convincing mosaic may include

> (1)  suspicious timing, ambiguous statements oral or written,
>      and other bits and pieces from which a retaliatory intent
>      might be drawn,
>
> (2)  evidence, but not necessarily rigorous statistical evidence,
>      that similarly situated employees were treated differently,
>      [or]
>
> (3)  evidence that the employer offered a pretextual reason for
>      an adverse employment action.

*Perez v. Thorntons, Inc.*, 731 F.3d 699, 711 (7th Cir. 2013) (quoting *Cloe v. City of Indianapolis*,

712 F.3d 1171, 1180 (7th Cir. 2013)). These categories are not a test, nor are they exclusive.

*Hobgood*, 731 F.3d at 644. However, one category by itself is usually not enough to establish a convincing mosaic. *Id.*

In this case, there is no relevant evidence about other, similarly situated employees. And, as Plaintiff himself alleges, the resignation meeting was occasioned as a result of the renewed allegations of child molestation, so there's no evidence of pretext. Further, the only example of protected expression that occurred *before* Plaintiff resigned are his oral complaints to Defendants King and Buffington about overtime payment coupled with Defendant Buffington's statement at her deposition that Plaintiff was not exempt from the FLSA. *See Cotto v. John C. Bonewicz, P.C.*, No. 13 C 842, 2015 WL 3609167, at *7 (N.D. Ill. June 9, 2015) ("[Section] 215 protects oral complaints." (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011))).[5] This evidence indicates, as discussed above, that Defendant Buffington and the School might have willfully violated Plaintiff's FLSA rights to overtime pay. There is, however, no evidence regarding suspicious timing nor could a reasonable factfinder looking at this evidence conclude that the requests for overtime pay played a role in the decision to ask Plaintiff to resign. Rather, the evidence suggests a single motive for that request, namely, the renewed allegations of child molestation.[6]

### 3. Other § 1983 Claims

As Plaintiff clarifies in his response, he thinks that the evidence before the Court shows that Defendants violated his constitutionally protected rights by defaming him and then banning him from School property. Defendants rejoin that the theories of liability now being advanced

---

[5] Plaintiff engaged in protected activity when he filed this lawsuit and when, ten months after he resigned, he asked the Department of Labor to look into the matter. But, as these complaints came well after he resigned, they don't show a causal link. Likewise, the emails he sent to the School after he resigned fail to suggest a causal link.

[6] As discussed above, the PERF benefits are not a remedy Plaintiff has shown he is entitled to under the FLSA, and the Court does not consider any FLSA retaliation claim regarding whether he was retaliated against for requesting PERF benefits, thought it seems it wouldn't make any difference.

are novel and should be barred as a de facto attempt to amend the Complaint. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (explaining that a plaintiff may not amend a complaint through arguments opposing a motion for summary judgment). This is not the case. It is true that Plaintiff did not mention the First or the Fourteenth Amendments in his Complaint, but he wasn't required to. *See* Fed. R. Civ. P. 8(a). The section of his Complaint dealing with his § 1983 claims specifically alleges that his civil rights (it doesn't specify which) were violated due to, among other things, the alleged defamation and the ban from School property. Plaintiff doesn't specifically say that his § 1983 claims are based on his firing, but, the first paragraph incorporates all those that came before it, which is sufficient to suggest that the resignation was also at play in his § 1983 claims.

Plaintiff makes three related arguments: (1) the ban, coupled with Buffington's defamatory statements at the administrator's meeting, took away his liberty interests without due process of law; (2) in banning him from School property, Defendants violated Plaintiff's equal protection rights by unjustifiably singling him out for unfavorable treatment; and (3) the ban restricted Plaintiff's First Amendment rights of free speech and free association without affording him the due process guaranteed by the Fourteenth Amendment. The Court considers each in turn.

### a. Deprivation of a Liberty Interest

Plaintiff was an at-will employee and he thus didn't have a property interest in his job protected by the Fourteenth Amendment's Due Process clause. *Lawson v. Sheriff of Tippecanoe Cnty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984).[7] And though defamation by government

---

[7] Defendants seem to misread Plaintiff's argument at this point. It isn't that he had a property interest in his job, as they seem to think, but that by forcing him to resign, defaming him, and then excluding him from School property, Defendants deprived him of a liberty interest without due process.

officials can have serious consequences, injury to reputation alone does not deprive the person who has been defamed of either property or liberty under the Fourteenth Amendment. *Id.* (internal citations omitted). However, when a government entity "fires an employee for stated reasons likely to make him all but unemployable in the future, by marking him as one who lost his job because of . . . job-related moral turpitude, the consequences are so nearly those of formally excluding him from his occupation that the law . . . insists that due process be provided." *Id.* at 1139.

Or, as other cases have explained, a liberty interest is implicated when a government entity alters someone's legal status (by, for example, firing him), and when either

> (1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts; or

> (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities.

*Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985). Branding someone a child molester—especially someone who works at a school—is a charge of immorality and would almost certainly stigmatize that person to some extent. But these facts are not enough because, under either prong, "the employee must show that, because the charges have been made, it is unlikely that anyone will hire him for a comparable job in the future." *Townsend v. Vallas*, 256 F.3d 661, 670 n.9 (7th Cir. 2001) (citing *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987)). Plaintiff has not shown this to be the case here. In fact, he currently works for Andrean High School in Merrillville, Indiana, where he his employed as Director of Information Technology—a position in the same field, but of higher rank. There is no evidence regarding how long it took for him to find this job after resigning. There is in fact nothing here indicating that he has suffered any harm

with regard to his ability to pursue his chosen profession. Summary judgment is therefore warranted on Plaintiff's § 1983 claim for deprivation of a liberty interest.

### b. Class of One Equal Protection Violation

Plaintiff contends that the decision to ban him from School property violates his equal protection rights by making him a "class of one" singled out for unfavorable treatment. Defendants point out that "the class-of-one theory of equal protection does not apply in the public employment context," contending that this is fatal to Plaintiff's claim. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008). The decision to fire Plaintiff was of course an employment decision, and the decision to ban him from School property flowed from it. But the Court need not decide whether this case falls within the employment context since Plaintiff has not shown any unequal treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Del Marcelle v. Brown Cnty. Corp.,* 680 F.3d 887, 903 (7th Cir. 2012). The closest analogue Plaintiff points to is a person who had also worked for the School who was banned from its property after admitting to having a sexual relationship with a minor who was a student at the School. But this falls far short of the requirement that the points of comparison be "identical in all relevant respects or directly comparable . . . in all material respects." *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (internal citations and quotation marks omitted). Accordingly, Defendants are entitled to summary judgment as to Plaintiff's class-of-one equal protection claim as there is no evidence that the way Plaintiff was treated was different from any similarly situated person.

### c. First and Fourteenth Amendment Violations

Plaintiff points to a number of expressions he contends implicate the First Amendment: (1) when he informed the School that the former student was again claiming that Plaintiff had

molested him, (2) when he sent a Facebook message to about 150 people who worked for the School (and encouraged those people to share the message with other employees who had not seen it), (3) when he asked Defendants about outstanding payment and benefit matters related to his work at the School, (4) when he asked to review the investigation file the School had put on the table the day he resigned, (5) when he asked about his ability to attend school events and to vote at his local polling station, which was on School property, and (6) when he published Facebook comments or messages that Defendant Buffington did not like. He also contends that the ban from School property infringes his First Amendment rights by preventing him from attending school board meetings.

The briefing on this issue is undeveloped, but there seem to be two distinct First Amendment issues at play: first, whether the School unlawfully retaliated against him for things he said, and second, whether the decision to ban him from School property abridged his First Amendment rights without due process. The Court considers each in turn.

Public employees retain some of their First Amendment rights to free speech. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009). And § 1983 allows them a remedy if those rights are violated. Those seeking to establish a *prima facie* case of unlawful First Amendment retaliation must show that they engaged in constitutionally protected speech and that the speech was a motivating factor in the employer's adverse employment action. *Valentino*, 575 F.3d at 670. With regard to the first point, speech is protected if it "addresses an issue of public concern." *Wallscetti v. Fox*, 258 F.3d 662, 666 (7th Cir. 2001). "The Constitution does not protect a public employee from workplace retaliation for statements that were intended not to alter public opinion or beliefs but merely to resolve a personal grievance on favorable terms." *Crowley v. McKinney*, 400 F.3d 965, 973 (7th Cir. 2005).

Much of the speech at issue, such as the requests regarding overtime pay and the like, are exactly such attempts and thus do not address matters of public concern. Plaintiff's informing the School that the former student had renewed the claims of child molestation might be construed as speech on a matter of public concern. *Cf. Wallscetti*, 258 F.3d at 667. But there's no evidence that Plaintiff's speech on this point motivated an adverse employment action. It was the substance of the issue, not Plaintiff's talking about it, that motivated Defendant Buffington to ask for his resignation. And, as Defendants point out, the boy had already called and left a voicemail message with the School by the time Plaintiff informed anyone about the renewed allegations. No reasonable factfinder could conclude that Plaintiff's bringing the issue to his employer's attention was a motivating factor in the decision to pressure him to resign.

It appears that, after being fired, Plaintiff also published some posts on Facebook that, according to Defendant Buffington, were threatening and played into her decision to continue barring Plaintiff from setting foot on School property. These posts (which are apparently not in the record) dealt with a private grievance stemming from the alleged forced resignation. Though this speech was a motivating factor in the decision to ban Plaintiff from School property, there is no other evidence about the content of these posts. There is therefore no reason to conclude that these posts addressed a matter of public concern. Summary judgment is therefore appropriate with regard to retaliation in violation of the First Amendment.

The Court next considers whether the ban from School property violates Plaintiff's First or Fourteenth Amendment rights. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-

800 (1985). What limits (if any) the Government can put on expression of protected speech depends on the type of forum the speaker seeks to use. *See Vukadinovich v. Bd. of Sch. Trustees of Michigan City Area Sch.*, 978 F.2d 403, 409 (7th Cir. 1992) (internal citations omitted). There are three types: "(1) the traditional public forum; (2) the public forum created by government designation; and (3) the nonpublic forum." *Id.* (internal citations omitted). Schools are the second type. *Id.* "[T]hey become public fora only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public' or by some segment of the public such as student organizations." *Id.* (internal quotation marks and citations omitted). There is no evidence presented to the Court in this case that the property was generally open for indiscriminate use. And insofar as Plaintiff is claiming the right to come onto School property when it is not open for indiscriminate use by the general public, his claim cannot proceed.

But School Board meetings are limited public forums, a subset of designated public forums. *See Ayres v. City of Chicago*, 966 F. Supp. 701, 712 (N.D. Ill.) (citing *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167 (1976)). The ban here is content neutral—it prohibits Plaintiff from coming onto school property because of the distraction he might bring not because of what he will say. The Government may thus "regulate the time, place and manner of expression which is narrowly-tailored to serve a significant government interest and leave open ample alternative channels of communication." *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see also Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 547 (D. Vt. 2014).

Keeping order on School property is a significant state interest. But an outright ban is not narrowly tailored to achieve that interest; indeed, "a categorical ban on speech is not tailored at all, as it entirely forecloses a means of communication." *Cyr*, 60 F. Supp. 3d at 548 (citing *Hill v.*

*Colorado*, 530 U.S. 703, 704 (2000)). And it is far from clear from the evidence presented by Defendants how order is protected by keeping Plaintiff off of the property at (almost) all times. As Defendants point out, Plaintiff has twice gotten permission to come onto school property: once to vote and another time to attend his niece's graduation. But these exceptions are not governed by anything but discretion. Moreover, there is no evidence that there are adequate alternative channels open to Plaintiff. *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1063 (7th Cir. 2004). Summary judgment is therefore unwarranted as to the First Amendment claim insofar as he alleges that he has been banned from attending school board meetings.

Since Plaintiff has shown that he's been deprived of a protected interest, the Court next considers whether that right was denied without due process. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996) ("Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." (citations omitted)). "Due process, the Supreme Court has repeatedly written, is a flexible concept that varies with the particular situation. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Legacy Healthcare, Inc. v. Feldman*, 11 F. App'x 589, 594 (7th Cir. 2001) (internal quotation marks and citations omitted).

The decision here was authorized by a school board policy that gives the Superintendent authority to "preserve the good order of the school district," including by excluding people from School property. Deprivations based on state procedures are governed by a balancing test of three factors:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest
> through the procedures used, and the probable value, if any, of
> additional or substitute procedural safeguards; and finally, the

25

> Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). As just discussed, Plaintiff has a strong interest in attending the school board meetings under the First Amendment. There is, moreover, a high risk of erroneous deprivation of this interest because the restriction was "not issued pursuant to any protocol, because they did not set out a process to contest the ban, and because [there is no] meaningful opportunity to contest his ban." *Cyr*, 60 F. Supp. 3d at 551. Further, the phrase "good order of the school district" grants very broad discretion to the superintendent. *See id.* (citing *Shuttlesworth v. Birmingham*, 394 U.S. 147, 153 (1969) ("[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places.") (quoting *Kunz v. New York*, 340 U.S. 290, 293–94 (1951))). The only process available to Plaintiff, moreover, is to ask that the ban be lifted, and there's no procedure for appealing the decision. *See id.* (citing *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1268 (11th Cir. 2011)).

Finally, with regard to the Government interest, there is no doubt that "the good order of the school district" is important, but there's no reason to think that the cost of explaining its decision or giving Plaintiff a chance to be heard would have been excessive. The Court therefore concludes that summary judgment is unwarranted as to Plaintiff's due process claim as it relates to his attendance at School board meetings.

Plaintiff also argues that he has a claim against Defendants under First and Fourteenth Amendments for failures to give him due process in ignoring his inquiries about outstanding payment and benefit matters and for forcing him to file a lawsuit to obtain documents that he was

entitled to receive without filing suit under the Indiana Access to Public Records Act. These arguments are completely undeveloped, and the Court declines to engage them.

Finally, Defendants contend that Plaintiff hasn't identified any actions performed by Defendants King and Stooksbury that implicate his state or federal rights. By choosing not to respond, Plaintiff has waived all these claims. *See Palmer v. Marion County*, 327 F.3d 588, 598 (7th Cir.2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned). Summary judgment is therefore granted in favor of Defendants King and Stooksbury.

### 4. Injunctive Relief

Defendants contend that Plaintiff is not entitled to a preliminary injunction, but this misses the point—Plaintiff isn't asking for a preliminary injunction, but a permanent one. There is thus nothing to grant summary judgment on in this regard.

### 5. Indiana Tort Claims Notice Act

Defendants contend that Plaintiff's state law claims are barred by the Indiana Tort Claims Notice Act (ITCA), Ind. Code § 34-13-3-1 *et seq.* That law bars claims against political subdivisions unless the plaintiff notifies the governing body of the political subdivision along with the Indiana political subdivision risk management commission within 180 days after the loss occurred. Ind. Code § 34-13-3-8. The notice "must be in writing and must be delivered in person or by registered or certified mail." Ind. Code § 34-13-3-12. It "must describe in a short and plain statement the facts on which the claim is based and must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of damages sought, and the residence of the

person making the claim at the time of the loss and at the time of filing the notice." *Id.* (quoting Ind. Code 34-13-3-10) (internal quotation marks omitted).

The term "political subdivisions" includes natural persons who work for the state, sued in their individual capacities, so long as they are being sued for acts done within the scope of their employment. *Chang v. Purdue Univ.*, 985 N.E.2d 35, 51 (Ind.Ct.App.2013) (quoting *Bienz v. Bloom*, 674 N.E.2d 998, 1004 (Ind.Ct.App.1996)). Compliance is a question of law for the court to consider. *Id.*

On May 15, 2013, more than a year after he resigned, Plaintiff sent an "Amended Notice of Tort Claim" to Defendant Stooksbury, which claimed that an original notice had been served by Plaintiff on Stooksbury via email on June 5, 2012. Defendants point out that the May 2013 notice comes well after 180 days after Plaintiff discovered his injury, and they argue that the email referenced in it fails the notice requirement.

Plaintiff argues that this shouldn't doom his state-law claims because his "state law claims are inextricably tied, especially defendant Buffington's defamatory pronouncement that plaintiff is a sexual deviant—to the continuing/permanent ban from School property." DE 28 at 25. But even when injury-causing conduct was continuous, "the doctrine of continuing wrong will not prevent the statute of limitations from beginning to run when the plaintiff learns of facts which should lead to the discovery of his cause of action even if his relationship with the tortfeasor continues beyond that point." *Fox v. Rice*, 936 N.E.2d 316, 322 (Ind. Ct. App. 2010) decision clarified on reh'g, 942 N.E.2d 167 (Ind. Ct. App. 2011) (quoting *C & E Corp. v. Ramco Indus., Inc.*, 717 N.E.2d 642, 645 (Ind. Ct. App. 1999)). Here, the initial "notice" demonstrates that, not only was Plaintiff aware of the facts, he was contemplating a lawsuit. Plaintiff thus cannot proceed with his state-law claims.

### III. Plaintiff's Motion for Partial Summary Judgment

In Plaintiff's Motion for Partial Summary Judgment he contends that banning him from school property limited his constitutional right to freely move and to travel, that the ban deprived him of a liberty interest by stigmatizing him, and that the ban unlawfully restricted his right to vote, since the School's property sometimes serves as a polling location. Though he sometimes writes as if he's only asking the Court to recognize that his claim is "cognizable," which would not be an appropriate inquiry on a Motion for Summary Judgment, his motion also states that he thinks that there is no genuine issue of material fact regarding whether the ban from School property "deprives plaintiff of his constitutional rights." DE 21 at 1. The Court therefore construes the motion as asking for partial summary judgment in Plaintiff's favor. The Court considers the arguments in turn.

Plaintiff argues that the Constitution grants him a liberty right to travel and loiter wherever he wishes and that the ban violates this right. The claim fails. He "has not alleged that the ban inhibits his ability to move from place to place"; "[h]e has not alleged that the only way to get from one location to another is to traverse school property, nor has he alleged that the ban prevents him from accessing substantial portions of the county" in which he resides. *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 756 (7th Cir. 2012). The absence of these types of allegations indicates that his claim is not properly characterized as infringing his right to intrastate travel. *Id.* "The right to intrastate travel protects the right to move from place to place, not the right to access certain public places." *Id.* And as explained above, there is no unqualified right to be on School property. *Vukadinovich*, 978 F.2d at 409 (7th Cir. 1992).

Plaintiff urges the Court to consider a 2010 case from the Sixth Circuit Court of Appeals cited in the *Hannemann* decision; that case recognized a "constitutionally-protected liberty

interest not to be banned from all City recreational property without procedural due process." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 330 (6th Cir. 2010). Plaintiff makes an argument that his case is factually more similar to *Kennedy* than *Hannemann*, focusing on how weak the School's argument for keeping him off school property is. Perhaps this is the case. But *Kennedy* was cited in *Hanneman* using the signal "*but see*" with reference to its holding that Supreme Court dicta on the "right to loiter" did not "compel[] recognition of a liberty interest in unfettered access to school grounds." *Hannemann*, 673 F.3d at 757 (7th Cir. 2012) (citing *City of Chicago v. Morales*, 527 U.S. 41, 53–54 (1999)). Tevenhe *Hannemann* court went on to hold that it was "not prepared to recognize a right for members of the public to loiter on school grounds." *Id.* The holding in *Hannemann* might benefit from some refinement, but this Court declines to attempt it here.

Plaintiff also argues that his case differs from *Hannemann* because the ban in this case was permanent. Plaintiff points to a hypothetical situation considered in *Hannemann* where "school officials refuse to consider a request to lift the ban and instead treat the ban as permanent." 753 n.3. The Court said that such an outright ban might implicate constitutional rights. *Id.* Taking the facts in the light most favorable to Defendants, however, it appears that, like *Hanneman*, the ban here is only indefinite; it has no fixed ending point. Indeed, Plaintiff seems to admit as much when he says that the ban is only *apparently* permanent. Moreover, Plaintiff can (and has) asked for permission to go onto School property and has received it on both occasions. This statement is dicta, and Plaintiff points to no binding law on the issue.

There is likewise no genuine issue of material fact with regard to the stigma claim. The facts before the Court taken in the light most favorable to Defendants (this is *Plaintiff's* Motion for Summary Judgment) do not show that he was defamed. And, moreover, he cannot show,

even when the facts are looked at in his favor, that "because the charges have been made" against him "it is unlikely that anyone will hire him for a comparable job in the future." *Townsend*, 256 F.3d at 670 n.9 (citing *Colaizzi*, 812 F.2d at 307). Nor can he show there was a change in his legal status, as he had no general right to go onto school property nor has he shown any other deprivation of his rights. *See Hannemann*, 673 F.3d at 755.

Plaintiff also argues that the ban affects his right to vote. This argument is undeveloped—all he says is that he has a right to vote and that the ban violates that right. This is not borne out by the record. He was given permission to come onto School property to vote the one time he has asked to do so, and there's no indication that, even if denied, he would be prevented from voting somewhere else or by absentee ballot. *Hannemann*, 673 F.3d 746, 755 n.5 (7th Cir. 2012) ("[Plaintiff] never establishes (or even asserts) . . . that absentee voting is unavailable[] or that school officials intend to enforce the ban during an election."); *see also McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 911 (10th Cir. 2002). He is thus not entitled to summary judgment on this claim.

## IV. Conclusion

The Court therefore **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment [DE 20]. The motion is **GRANTED** in favor of Defendants as to Plaintiff's Count X claim of FLSA retaliation, as to all of his Count VII § 1983 claims except the claim that he has been unconstitutionally barred from school board meetings, and as to all of his state law claims (Counts II, III, IV, V, VI, VIII, and IX). The motion is **DENIED** as to his Count I claim for unpaid FLSA benefits (with the exception of his claim for PERF benefits, which is **GRANTED**) as well as the Count VII claim that he has a constitutional right to go onto School property for school board meetings. The Count XI request for other injunctive relief is **DENIED**.

The Court **DENIES** both Plaintiffs' Motion for Partial Summary Judgment [DE 21] and Defendants' Motion to Strike Affidavit [DE 41].

SO ORDERED this 6th day of August, 2015.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT